Alice W. WARNER, as Personal Representative of the Estate of Sidney G. Warner, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 79–313 K.

United States District Court, M. D. Florida, Tampa Division.

June 24, 1981.

Louis M. Silber, West Palm Beach, Fla., for plaintiff.

Mary Ann Murphy, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

REGAN, District Judge.

Sidney G. Warner, a 71 year old retired college professor and industrial designer, and his wife Alice W. Warner, were vaccinated on November 20, 1976 with swine flu vaccine administered pursuant to the provisions of the National Influenza Immunization Program of 1976. The Warners were two of over 42 million persons who were vaccinated under the Program. Mr. Warner died on March 24, 1978.

Approximately one year later, after exhausting administrative remedies, his widow, as personal representative, filed this action alleging that her husband's death resulted from the swine flu inoculation. We have jurisdiction under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq. and the National Swine Influenza Immunization Program, 42 U.S.C. § 247b. The action was transferred to the United States District Court for the District of Columbia for consolidated pretrial proceedings in *In re Swine Flu Products Liability Litigation* and thereafter was remanded to this Court for trial.

The considerations which led to the government's decision to attempt the inoculation of the entire population of the United States against what our policy makers perceived to be an extremely serious potential threat of a swine flu epidemic are now well known and need not be here repeated. See e. g., *Hunt v. United States,* 636 F.2d 580 (D.C.Cir.1980). Whether in the light of infallible hindsight, "This massive [and costly] gamble in preventive medicine" was a gigantic mistake in judgment is not for us to say. We are concerned only with the factual and legal aspects of the Warner claim.

The basic factual issue is the causal relationship between the swine flu inoculation and Mr. Warner's death sixteen months later. It is plaintiff's position that the illness from which Mr. Warner ultimately died was the neurological disorder of postvaccinal encephalitis or encephalopathy caused by the swine inoculation. On the other hand, defendant contends not only that the swine flu vaccine did not cause encephalitis or encephalopathy but that neither postvaccinal encephalitis nor encephalopathy was the cause of Mr. Warner's death.

The burden is upon plaintiff to prove by a preponderance of the evidence that Mr. Warner's death was causally related to his inoculation with swine flu vaccine. That Mr. Warner had a neurological disorder of some kind which first manifested itself some seven to nine days after his inoculation is not disputed. So, too, the evidence is uncontradicted that prior to November 20, 1976, Mr. Warner was in apparent good health with no loss in his mental capabilities except for occasional mental blocks.

There was no noticeable immediate reaction to the swine flu inoculation. Five days later, Mr. Warner drove approximately 200 miles to spend the Thanksgiving weekend with friends. Two days after he returned to his home he began to exhibit some indications of illness other than tiredness, and on November 29 he was taken to a doctor in a state of confusion and disorientation. Late that evening he was admitted to the Sun Coast Osteopathic Hospital for evaluation.

The treating doctor at the hospital was a neurologist, Dr. William Hulley. While at the hospital, Mr. Warner underwent a number of tests and studies, but nothing definite was ascertained. He was discharged as "improved" on December 11, with an admittedly "tentative" diagnosis of post-vaccinal encephalitis and Alzheimer's disease. At home, Mr. Warner exhibited apparent improvement, participating in the entertainment of guests and in playing bridge. However, on January 23, 1977, he was again hospitalized with confusion and involuntary movements in all four extremities simulating myoclonic jerks. Then followed a series of discharges from and readmissions to the Sun Coast Hospital, these hospitalizations ranging in duration from a week to a month.

For the most part the intervals between the hospitalizations were relatively short. However, a period of over five months

elapsed between Mr. Warner's sixth (June 7, 1977) discharge from the Sun Coast Hospital and his readmission on November 18, 1977. Finally, on February 1, 1978, Mr. Warner was admitted to the Veterans Administration Hospital and during that stay he developed pneumonia and died.

On the basic issue of whether the swine flu inoculation caused or contributed to cause Mr. Warner's death, the medical experts are in disagreement. Plaintiff relies principally upon the testimony of the treating neurologist, Dr. Hulley, and three non-treating experts, Dr. Leon Prockup, Dr. William Sheremata, and Dr. Charles Poser who examined the medical records and autopsy finding. Drs. Hulley and Prockup testified that they believed that the most reasonable diagnosis of Mr. Warner's illness was postvaccinal encephalitis caused by the swine flu vaccination. Drs. Poser and Sheremata described the illness as encephalopathy. However, all of plaintiff's experts relied in large part upon the temporal relationship between the inoculation and the onset of various symptoms described in the hospital records. For example, Dr. Hulley testified that "the most conclusive thing" on which he based his "feeling" as to the cause of Mr. Warner's illness and death was the temporal relationship.

Significantly, all during the time Mr. Warner was alive, Dr. Hulley was admittedly unable to make a firm diagnosis of his illness, other than "progressive degenerative disease." Dr. Hulley's vacillation and uncertainty is evident in the hospital records. As late as November 24, 1977, a year after the inoculation, his diagnosis was "Alzheimer's disease." And although the picture he attempted to paint in his trial testimony was that of a man who was completely confused and disoriented, the neurologic examination on November 18, 1977 (when hospitalization followed a seizure), states: "Patient is mentating well with a fair memory and recall."

We have adverted to the fact that over five months elapsed between Mr. Warner's sixth hospitalization (as the result of a seizure) and his seventh on November 18, 1977. Strangely, there is no specific testimony respecting Mr. Warner's condition during that five month period. Of importance, however, is the history given by plaintiff when her husband was admitted to the Veterans Administration Hospital on February 1, 1978. She then stated that each time Mr. Warner was discharged from the Sun Coast Hospital (which would include the discharge of June 7, 1977), he was mentally competent until around November 1977 when she noticed that he started to lose interest in his hobbies, stopped driving and stopped conversing in a normal manner. Neither Dr. Hulley nor the other experts commented on this phase of Mr. Warner's condition.

In explaining his opinion, Dr. Prockup testified: "The man was well; he had the flu vaccine; and he comes down with encephalitis. In my mind, it has to be cause and effect unless there is some other cause for it. And there is no other cause as far as I could determine from the records . . . . Now, I agree that this is a rare complication. It is a very rare complication of any immunization and particularly this particular episode . . . ." He conceded not only that Mr. Warner's case was atypical for encephalitis, but that he could not rule out the possibility of an "ideopathic disorder", that is, one without a known cause.[1] As for Dr. Sheremata, his explanation for believing that the vaccination was the cause of Mr. Warner's illness was that he "presumed" (or speculated) that some unknown something in the vaccine with which Mr. Warner was inoculated did something to prevent the body's suppressor cells from performing their function.

Dr. Poser, plaintiff's remaining expert, testified that in his opinion (based on the clinical history, the laboratory data and the autopsy findings) "Mr. Warner developed shortly after the swine flu vaccination a

---

1. Nowhere in the Veterans Administration Hospital record is there any note made during Mr. Warner's lifetime indicative of any postvaccinal encephalitis diagnosis by Dr. Prockup, or for that matter by any other neurologist on the hospital staff.

form of post-vaccinal encephalopathy." He emphatically asserted that Mr. Warner's illness was not encephalitis, which he stated is an acute viral disease. Strangely, not once in his direct examination did he express any opinion as to the cause of Mr. Warner's *death* or its relationship to the swine flu inoculation. On cross-examination (and again on re-direct) Dr. Poser's attention was called to a pre-trial report he had issued to plaintiff's attorney in which he stated that his review of the medical data substantiated his diagnosis of "chronic post-vaccinal encephalomyelitis resulting in this patient's death, confirmed by autopsy findings." This barebones statement with no elaboration or explanation is the only opinion expressed by Dr. Poser on the crucial issue of causation of *death.*

In our judgment, in spite of his impressive credentials, Dr. Poser was far more of an advocate than a credible objective witness. He admitted that Mr. Warner's case was atypical for encephalopathy (as it was for encephalitis) and that it was "very unusual." In this connection, he testified that the case was unusual, first because Mr. Warner died, and second because his illness was of long duration. He was "disturbed" by the absence of demylination. And as we have noted, Dr. Poser expressly conceded that "to a large extent" his opinion was based on the temporal relationship between the inoculation and the onset of some symptoms. He dismissed, as without significance, the fact that the epidemiological surveillance study made by the Center for Disease Control had found no increased incidence of any neurological illness following the swine flu immunization program other than Guillian-Barre Syndrome, an illness Mr. Warner did not have.

Experts with credentials as impressive as those of the plaintiff's experts (Drs. Jerry Wolinsky, Paul Winters, James Lehrich and Edward Richardson) testified for the government at length that although some (but not all) of the symptoms in the very early stages of Mr. Warner's illness were consistent with some type of encephalitis of unknown etiology, the subsequent course of his neurological disorder convinced them that he did not have a postvaccinal encephalitis or encephalopathy. They were firmly of the opinion, bolstered by the epidemiological studies of the Center for Disease Control, that there was no causal relationship between Mr. Warner's "unusual and rare neurological disease" (whatever it may have been) and his swine flu inoculation.

Viewing the evidence as a whole, we are convinced that it is purely speculative whether there is any causal connection between Mr. Warner's November 20, 1976 inoculation with swine flu vaccine and his death some sixteen months later. It follows that plaintiff failed to sustain her burden of proof as to causation and is not entitled to recover.

Although this finding moots the issue of informed consent, it is our view that Mr. Warner was adequately warned of the risks from the swine flu vaccine.

The foregoing Memorandum and Order constitutes our findings of fact and conclusions of law. The Clerk is hereby ordered to enter judgment in favor of defendant in accordance herewith.