### Arlene GICAS and Thomas Gicas, Plaintiffs,

v.

### UNITED STATES of America et al., Defendants.

### Civ. A. No. 78–C–470.

United States District Court,
E. D. Wisconsin.

Feb. 10, 1981.

Dawn B. Lieb, Habush, Habush & Davis, S. C., Milwaukee, Wis., for plaintiffs.

Joan F. Kessler, U. S. Atty., by Melvin K. Washington, Asst. U. S. Atty., Milwaukee, Wis., Debra D. Newman, Trial Atty., Dept. of Justice, Torts Branch, Washington, D. C., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

REYNOLDS, Chief Judge.

The plaintiffs Arlene Gicas and Thomas Gicas brought this action pursuant to the

---

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq., in conjunction with the National Influenza Program of 1976 ("Swine Flu Act"), P.L. 94–380 (codified at 42 U.S.C. § 247b(j)–(1)), in which action they seek damages for Arlene Gicas' allegedly contracting rheumatoid arthritis as a result of a swine flu inoculation.

On September 5, 1978, this case was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. On December 26, 1979, it was remanded back to this court for further proceedings and trial. Trial was held January 26 through 29, 1981. On January 27, 1981, the Court ordered the trial bifurcated pursuant to Rule 42(b) of the Federal Rules of Civil Procedure to determine the issue of causation. After listening to all the evidence relating to the issue of whether the plaintiff Arlene Gicas ("Gicas") contracted any injury as a proximate cause of her swine flu inoculation, the Court ruled from the bench that the swine flu inoculation did not cause the plaintiff's injuries.

The following constitutes the Court's findings of fact and conclusions of law.

## INTRODUCTION *

The Swine Flu Act of 1976 was an attempt by the federal government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history, and over 45 million Americans—or one-third of the adult population—were vaccinated. The initial vaccination was on October 1, 1976, and the program was suspended on December 16, 1976. The program, for which 135 million dollars was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November 1976. The November deadline was critical since the

season of intense flu transmission in the United States is generally considered to be September through March.

The Swine Flu Act ("Act") became law on August 12, 1976, and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the Act or omissions of a program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty; 42 U.S.C. § 247b(k)(2)(A);

2. It makes that cause of action the exclusive remedy (42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and

3. It makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act (42 U.S.C. § 247b(k)).

The program was prompted in part by the medical discovery in early February 1976 at Fort Dix, New Jersey, of military servicemen having a new strain of influenza virus antigenically related to the virus prevalent during the 1918–1919 swine flu pandemic. That pandemic was responsible for 20 million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to humans with no secondary person-to-person transmission.

In addition, the Swine Flu Act was prompted by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants. The cases of *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968),

* This introduction is substantially taken from *Bean v. United States*, 79–F–571 (D.C.Colo., Aug. 19, 1980), because it is a clear and concise statement of the situation necessary for a full understanding of this matter. Authorities and footnotes from *Bean* have been omitted.

and *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974), which held a manufacturer of polio vaccine strictly liable in tort greatly contributed to the insurance problem. For this reason the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States. However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States (42 U.S.C. 247b(k)(7)) if the United States is found to be liable on a negligence theory.

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–1977. As can be expected, however, many people who were inoculated also incurred some type of illness, injury, or adverse medical condition in a period relative to the vaccination. Lawsuits, such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed.

## FINDINGS OF FACT

The following are the Court's findings of fact under Rule 52 of the Federal Rules of Civil Procedure:

1. The plaintiff Arlene Gicas, a forty-nine year old woman, is a resident of the State of Wisconsin and the County of Milwaukee where the swine flu inoculation was administered.

2. On November 4, 1976, Gicas received the swine flu inoculation at the Milwaukee City Health Center, 7630 West Mill Road in Milwaukee. Three or four days after her inoculation, Gicas developed pain, swelling, and stiffness in her fingers, wrists, ankles, and knees.

3. On November 26, 1976, Gicas was examined by an osteopath, Dr. Jerry Yee. Dr. Yee's report indicated that she experienced pain and swelling in the area at the base of her right thumb as well as tenderness and inflammation in her knees, ankles, and right thigh. Dr. Yee's report further indicated a past history of pain and swelling in her thumb that predated her inoculation, and that she associated this past history with too much job-related writing or too much pressing downward while writing.

4. During his examination of the plaintiff, Dr. Yee performed several tests on her, including a uric acid test, a sedimentation rate test, and a rheumatoid factor test. He also took x-rays of both her knees, her right hand, and her right ankle.

5. On November 29, 1976, Dr. Yee informed the plaintiff of her laboratory test results and gave her his diagnosis. Based on his laboratory tests, Dr. Yee concluded that Gicas had rheumatoid arthritis. The x-rays, however, showed no signs of rheumatoid arthritis. Thereafter, he examined her on several occasions. Those examinations indicate that the plaintiff has had inflammation and swelling in her joints off and on since 1976.

6. At trial, Dr. Yee testified that based on his examination of the plaintiff and on his familiarity with the plaintiff's medical history, he had the following opinions to a reasonable degree of medical probability: (a) that the plaintiff had rheumatoid arthritis; (b) that the plaintiff had no history of rheumatoid arthritis prior to her inoculation; (c) that the plaintiff's injuries are permanent; and (d) that the plaintiff contracted rheumatoid arthritis as a result of her swine flu inoculation.

7. On cross-examination by the Government, Dr. Yee further testified that: (a) he is a general osteopath, not learned in the fields of epidemiology, etiology, or immunology; (b) he has not read and was unaware of any reports in medical literature establishing that rheumatoid arthritis was reported following any immunizations in general or the swine flu immunization in particular; and (c) the cause of rheumatoid arthritis is unknown.

8. Based on Dr. Yee's knowledge of the medical literature, on his knowledge of vaccines, and on his knowledge of the fields of epidemiology, etiology, and immunology, the Court finds that Dr. Yee's opinion that there is a causal relationship between the swine flu inoculation and the plaintiff's injuries is no credible evidence at all. In-

stead, the Court finds that Dr. Yee's opinion was based on nothing more than a temporal relationship between the date of the swine flu inoculation and the onset of the plaintiff's injuries.

9. In addition to the live testimony of Dr. Yee, the plaintiff offered the deposition of Dr. Joseph A. Bellanti. Dr. Bellanti has a long list of credentials; he is a professor of pediatrics and microbiology at the Georgetown University of Medicine and director of the Center for Interdisciplinary Studies of Immunology, Georgetown University; he is also the author of numerous articles published in the medical literature, a member of numerous medical societies, and the recipient of numerous awards.

In his deposition, Dr. Bellanti testified that an inoculation can give rise to an auto-immune response; that is, the introduction of disease-preventing vaccine antigens can stimulate the production of self-destructing antibodies with resulting inflammation, swelling, and possibly destruction of body joints. Dr. Bellanti further testified that he had the following opinions to a reasonable degree of medical probability: (a) that the plaintiff had rheumatoid arthritis, and (b) that the cause of Gicas' injuries was directly related to her receipt of the swine flu inoculation. These opinions were based on information contained in Dr. Yee's medical records, on the temporal relationship between the date of the swine flu inoculation and the onset of the plaintiff's injuries, on his knowledge of rheumatoid arthritis, and on his review of some articles relating to arthritis that followed another flu outbreak but not an outbreak of swine flu.

When questioned by Government counsel, Dr. Bellanti admitted the following: that this was the first rheumatoid arthritis case associated with swine flu vaccination of which he was aware; that he was unaware of any reports in the medical literature associating rheumatoid arthritis with the receipt of swine flu vaccine; that he was also unaware of any evidence other than Gicas' case where swine flu vaccination had caused an incidence of rheumatoid arthritis; that the cause of rheumatoid arthritis is unknown; and, finally, that no conclusive evidence linked any earlier strain of flu virus with the 1976 strain of flu virus that prompted the Swine Flu Act of 1976.

Although the Court has considered with interest Dr. Bellanti's theory that an auto-immune response to the swine flu vaccine caused Gicas' injuries, the Court finds that this theory amounts to no more than a hypothesis. The Court further finds that there is little support in the medical literature for Dr. Bellanti's theory, and that such theory does not bear remotely the inprimateur of the medical community. Indeed, as will be detailed below, the Court finds that the overwhelming weight of the medical literature opposes a theory that associates swine flu vaccine to the plaintiff's injuries. No authority other than Dr. Bellanti has causally related rheumatoid arthritis with a swine flu inoculation. Based on these findings, and for the reasons that Dr. Bellanti's opinion was based in part on Dr. Yee's medical reports and that Dr. Bellanti knows of no evidence other than this case that supports his theory of an auto-immune arthritic response to swine flu vaccine, the Court further finds that Dr. Bellanti's opinion that there is a causal relationship between swine flu inoculation and the plaintiff's injuries is no credible evidence at all. Instead, the Court finds that Dr. Bellanti's opinion was based on nothing more than a temporal relationship between the date of the swine flu inoculation and the onset of the plaintiff's injuries.

10. On January 23, 1981, Gicas was examined by Dr. Walter R. Sundstrom. Dr. Sundstrom is a professor of medicine at the University of Wisconsin Medical School and a resident physician at the University of Wisconsin Clinical Science Center in the William S. Middleton V.A. Hospital; he specializes in internal medicine and rheumatology, and in regard to the latter specialty, he is chief of the section of rheumatoid diseases at the University of Wisconsin Medical School and the V.A. Hospital. As chief of those sections, Dr. Sundstrom currently oversees the care and treatment of over 500 patients with arthritis.

Dr. Sundstrom's diagnosis of Gicas' injuries differed markedly from that of Dr. Yee. Dr. Sundstrom's examination and the tests that he performed on the plaintiff revealed that the plaintiff enjoyed a full range of motion in her joints. Moreover, the tests revealed no evidence of inflammatory joint disease or joint destruction. Based on his examination of Gicas, his review of her medical records and history, and his extensive experience in the field of rheumatology, Dr. Sundstrom opined to a reasonable degree of medical certainty that the plaintiff had arthralgis (joint soreness), not rheumatoid arthritis (tissue softness).

Dr. Sundstrom also testified on the issue of whether or not Gicas contracted any injury as a result of her swine flu inoculation. He stated that he was unaware of any evidence linking the inoculation of a killed virus vaccine with rheumatoid arthritis; that he was unaware of any evidence supporting a claim of rheumatoid arthritis being stimulated by a precipitating event, such as an inoculation; that he was unaware of any documented case of the contraction or exacerbation of rheumatoid arthritis by swine flu vaccine; and that he was unaware of any cause of rheumatoid arthritis. Based on his review of the medical literature, his knowledge of vaccines and rheumatology, and his extensive experience in the field, Dr. Sundstrom opined to a reasonable degree of medical certainty that there was no causal relationship between the swine flu inoculation and Gicas' injuries.

Finally, when asked on cross-examination whether the pain and the swelling in the area at the base of the plaintiff's thumb was significant, Dr. Sundstrom stated that this symptom could be indicative of a prior rheumatoid state.

The Court finds Dr. Sundstrom's testimony to be very persuasive and credible. Not only are his credentials quite impressive, but Dr. Sundstrom's opinion that there is no relationship between the swine flu inoculation and Gicas' injuries other than a temporal relationship is supported by the overwhelming weight of the medical literature, as will be noted below.

11. In addition to the live testimony of Dr. Sundstrom, the Government offered the deposition testimony of Drs. Stephen Schoenbaum, Neal Nathanson, Jonas Salk, Sir Charles Stewart-Harris, Fred M. Davenport, D. A. Henderson, Henry F. Retailliau, Gordon Meiklejohn, and William Marine. Each of these doctors has impressive credentials. Dr. Schoenbaum, an internist and epidemiologist, is an assistant professor of medicine at the Peter Bent Brigham Hospital in the Harvard Medical School and director of medical services at Boston Hospital for Women. Dr. Nathanson, a virologist and epidemiologist, is chairman of the department of microbiology at the University of Pennsylvania Medical School. While at Johns Hopkins University, Dr. Nathanson was a professor of medicine and head of the division of infectious diseases in the department of epidemiology. Dr. Salk, a world famous epidemiologist, bacteriologist, and immunologist, is founding director of the Salk Institute of Biological Studies at San Diego, California, and an adjunct professor in health science at the University of California. Among his achievements is the development of a killed-virus vaccine to prevent poliomyelitis. Sir Charles Stuart-Harris, whose interests have lain in the field of infectious diseases, is a worldwide expert in influenza; he is an emeritus professor of medicine in the University of Sheffield's Medical School in England. Dr. Davenport, an epidemiologist, is an emeritus professor of medicine at the University of Michigan Medical School. Dr. Henderson, an epidemiologist, is dean of the School of Hygiene and Public Health at Johns Hopkins University. Dr. Retailliau, an epidemiologist, is a clinical instructor at the Emory University School of Medicine as well as an epidemiologist and preventive medicine resident at the Center for Disease Control in Atlanta, Georgia. Dr. Meiklejohn, a virologist, epidemiologist, and clinician, is a professor of medicine in the division of infectious diseases at the University of Colorado Medical School. Dr. Marine, a virologist, etiologist, and immunologist, is professor and chairman of the department of preventative

medicine and comprehensive health at the University of Colorado, as well as having a subspecialty assignment in infectious diseases at the University of Colorado Medical Center.

In short, Drs. Schoenbaum, Nathanson, Salk, Stewart-Harris, and Retailliau testified that with the exception of Guillain-Barre Syndrome and rare cases of anaphylasic, no other serious illnesses were caused by swine flu inoculations. Based on the testimony of these experts, the Court finds no evidence of a causal connection between the swine flu inoculation and the plaintiff's injuries. In brief, Drs. Davenport, Meiklejohn, Salk, Marine, and Henderson testified that the only material and usual immunological reactions caused by the swine flu inoculations were local reactions (tenderness at the site of the inoculation), constitutional reactions (fever, headache, and muscle aches lasting approximately twenty-four hours), and allergic reactions (hypersensitive reactions among individuals allergic to eggs). Based on the testimony of these experts, the Court finds no evidence of a causal connection between the swine flu inoculation and the plaintiff's injuries.

12. Based on the evidence relating to the nature of the plaintiff's injuries, the Court finds that the plaintiff did not contract rheumatoid arthritis.

13. After considering all the evidence relating to the issue of whether the plaintiff contracted any injury as a result of her swine flu inoculation, the Court finds that no credible evidence supports a causal relationship between the swine flu inoculation and the plaintiff's injuries. Rather, the Court finds that the evidence supports nothing more than a temporal relationship between the date of the plaintiff's swine flu inoculation and the onset of her condition.

## CONCLUSIONS OF LAW

 Under Wisconsin law, the plaintiff must show by the preponderance of evidence that the defendant's act was a substantial factor in causing the plaintiff's injury. *Johnson v. Misericordia Hospital*, 97 Wis.2d 521, 294 N.W.2d 501 (1980); *Merco*

*Distributing Corporation v. Commercial Police Alarm Company, Inc.*, 84 Wis.2d 455, 267 N.W.2d 652. A temporal relationship between the date of the swine flu inoculation and the onset of the plaintiff's injuries is an insufficient basis upon which to attribute causation. See *Cikins v. United States*, C.A. No. 78–328–A (E.D.Va., June 16, 1980).

 Based on the findings of fact enumerated above, the Court concludes that the plaintiffs have failed to prove by a preponderance of the evidence that there was a causal relationship between the swine flu inoculation received by the plaintiff Arlene Gicas and her injuries. Accordingly, this action is dismissed, the parties shall bear their own respective costs, and judgment will be entered in favor of the defendants.

IT IS SO ORDERED.