533 F.Supp. 581 (1981)
In re SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION.
Alvin THOMPSON, Plaintiff,
v.
UNITED STATES of America, Defendant.
Civ. A. No. 80-F-203.
United States District Court, N. D. Oklahoma.
October 28, 1981.
Mitchell A. Lee and Eddie Harper, Oklahoma City, Okl., for plaintiff.
Deborah Ratner, Washington, D. C., for defendant.

MEMORANDUM OPINION AND ORDER
SHERMAN G. FINESILVER, District Judge[1]:
In this suit, brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq.,[2] plaintiff Alvin *582 Thompson seeks recovery from the United States of America for damages allegedly sustained as a result of his swine flu inoculation.
The government has stipulated that Mr. Thompson contracted Guillain-Barre Syndrome ("GBS") sometime subsequent to his inoculation. As a result, plaintiff is not required to establish a theory of liability in order to recover against the government. He need only prove that his GBS was proximately caused by the swine flu vaccine. See Stipulation and Final Pre-Trial Order, Paragraph IX, In re Swine Flu Immunization Products Liability Litigation, 89 F.R.D. 695 (D.D.C.1979).
Plaintiff alleges that he suffered GBS as the proximate result of the swine flu vaccine. He contends that he developed symptoms of GBS approximately eight weeks after his inoculation. The government maintains that plaintiff did not develop GBS until eleven weeks following the shot, thus, there is no evidence linking his GBS and the swine flu vaccine.
For the reasons set out below, we find that Mr. Thompson did not prove by a preponderance of the evidence that his GBS was proximately caused by the swine flu vaccine.
The following reflect our findings and conclusions on the sole issue before us: whether or not there is a causal relation between plaintiff's GBS and the swine flu vaccine.

I.

BACKGROUND
Plaintiff, Alvin Thompson, is a sixty-four year old resident of Pryor, Oklahoma. He worked in the grocery business for ten years before retiring in 1969 due to a heart attack. Between 1969 and 1976 Mr. Thompson remained in relatively good health. He worked around his house and walked approximately twelve to sixteen miles daily as part of his continued rehabilitation. He testified that he considered himself an "active retiree" in 1976 and was considering going back to work.
In the fall of 1976 Mr. Thompson received a swine flu vaccination as part of the national swine flu program. The exact date of his inoculation is in dispute. Plaintiff testified that he received the shot on November 16, 1976. He based this on his belief that he received the shot on the first Tuesday following his wedding anniversary, November 13, 1976.
The government maintains that Mr. Thompson received his vaccination sometime before October 25, 1976. It relied on a "BIVALENT INFLUENZA CLINIC DATA SHEET  Registration Form" (Government Ex. B) returned to the Oklahoma Department of Health on October 25, 1976. These forms show that a vaccinee read the information sheet on the swine flu vaccine before being inoculated. A vaccinee was required to sign the registration form in order to be vaccinated. (Testimony of Dr. Mark A. Roberts, Oklahoma State Epidemiologist).
Mr. Thompson's signature appeared on the Registration Form returned to the Oklahoma Department of Health on October 25, 1976. (Government Ex. B). He received his shot in the office of his physician, Dr. Richard A. Martin. The office notes of Dr. Martin did not reveal the exact date of the inoculation.
However, Dr. Martin testified that Mr. Thompson must have received the shot on *583 or before October 25, 1976. He based this on the fact that the signature of a Mr. H. M. Voss appeared on the same Registration Form, five lines below the signature of Mr. Thompson. (Government Ex. B). Further support of this date is a notation in Dr. Martin's office notes that Mr. Voss had chills and a headache following his swine flu shot on October 25, 1976. (Testimony of Dr. Martin).
We are persuaded that the Registration Form, dated October 25, 1976, and the testimony of Dr. Martin, establish that Mr. Thompson received his swine flu shot on or before October 25, 1976.
On November 4, 1976 Mr. Thompson complained to Dr. Martin of a decreased stream while urinating. On December 7, 1976 Mr. Thompson suffered an episode of gross hematuria (blood in urine). Dr. Martin referred him to Dr. Michael Smith, a urologist in Tulsa, Oklahoma. Plaintiff was admitted to St. Francis Hospital in Tulsa on December 28, 1976, and underwent a cystoscopy[3]. The results of this test were essentially negative.
On December 30, 1976, after his discharge from the Hospital, plaintiff developed chills, a fever, and had difficulty urinating. He was admitted to Grand Valley Hospital in Pryor, Oklahoma on December 31, 1976 for tests. He was diagnosed as having a urinary tract infection and a possible sepsis secondary to the cystoscopy. (Government Ex. aa). He was treated with antibiotics and released on January 4, 1977.
Mr. Thompson awoke on January 8, 1977 with a tingling sensation and clumsiness in his lower extremities. He testified that he was "paralyzed" and thought he had suffered a stroke. Over the next two days the symptoms spread to his arms as well. He was admitted to St. Francis Hospital on January 10, 1977 with a diagnosis of possible Guillain-Barre Syndrome.
Physical and neurological examination revealed diminished deep tendon reflexes and general weakness in all four extremities. (Government Ex. z). A spinal tap upon admission showed a cerebrospinal protein of 42 mg., which is normal. A subsequent spinal tap revealed an increase in cerebrospinal protein to 132 mg. Nerve conduction velocity studies were slightly abnormal, suggesting a peripheral neuropathy. (Id.) These findings comport with the diagnostic criteria established by the National Institute of Neurological Communicable Diseases and Stroke ("NINCDS").
Mr. Thompson was released from the hospital on January 24, 1977 with a final diagnosis of Guillain-Barre Syndrome  stable and improving. (Id.) He continues to have some residual effects, particularly weakness, from his GBS.

II.

MEDICAL TESTIMONY
At trial, we had the benefit of the following experts and their testimony: Charles M. Poser, M.D.; and John D. Hastings, M.D. In addition, we have reviewed extensive medical literature, including: Keenlyside & Schonberger et al., Fatal Guillain-Barre Syndrome After the National Influenza Immunization Program, 30 Neurology 929 (September 1980); Arnason, Inflammatory Polyradiculoneuropathies, in Diseases of the Peripheral Nervous System, chapter 56 (Dyck et al., ed.) (1976); Leneman, The Guillain-Barre Syndrome: Definition, Etiology, and Review of 1,100 Cases, 118 Archives of Internal Medicine 139 (1966); McFarland and Heller, Guillain-Barre Disease Complex: A Statement of Diagnostic Criteria and Analysis of 100 Cases, 14 Archives of Neurology 196 (1966); Samantray et al., Landry-Guillain-Barre-Strohl Syndrome: A Study of 302 Cases, 2 Medical Journal of Australia 84 (1977); Kennedy et al., Guillain-Barre Syndrome: A 42-Year Epidemiologic and Clinical Study, 53 Mayo Clinic Proceedings 93 (1978); Marshall, The Landry-Guillain-Barre Syndrome, 86 Brain 55 (1963); Dowling and Cook, Role of Infection *584 in Guillain-Barre Syndrome: Laboratory Confirmation of Herpesviruses in 41 Cases, 9 Annals of Neurology 44 (Supp. 1981); Hayner, Relationship of Guillain-Barre Syndrome to Influenza Vaccination and Other Factors in Michigan, Michigan Department of Public Health (December 11, 1980); Schonberger et al., Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States 1976-1977, 110 American Journal of Epidemiology 105 (1979).
Dr. Poser is a clinical neurologist and Professor of Neurology at Boston University School of Medicine. Prior to this position, Dr. Poser was Professor and Chairman of the Department of Neurology at the University of Vermont. He testified as to the probable cause of Mr. Thompson's GBS. He stated that Mr. Thompson's GBS was caused by the swine flu vaccination.
Dr. Poser felt that there were two possible etiologies for Mr. Thompson's GBS: the swine flu vaccine or the urinary tract infection ("UTI") suffered by Mr. Thompson in December, 1976. Dr. Poser stated three reasons for his belief that the UTI was not the cause.
First, he testified that Mr. Thompson's UTI was bacterial and not viral. He determined this from a review of the medical records. He testified that bacterial infections do not have the same "power" to activate immune responses, such as GBS, as does a viral infection. Dr. Poser cited medical articles that indicate GBS is linked to an antecedent bacterial infection in significantly less than two percent of the reported cases. See Leneman, supra.; McFarland and Heller, supra.; Samantary et al., supra.; Kennedy et al., supra.; Marshall, supra.; and Dowling and Cook, supra.
Second, Dr. Poser noted that the studies of persons who contracted GBS after receiving a swine flu vaccination showed a large number also had an infection within four weeks of inoculation. Thus, he stated, the presence of the UTI in Mr. Thompson approximately five weeks after his inoculation is not significant.
Finally, Dr. Poser testified that of the two possible etiologies, the swine flu vaccine was more probably the cause of Mr. Thompson's GBS. He felt this would be true even if the date of Mr. Thompson's inoculation was sometime before October 25, 1976.
In Dr. Poser's opinion, the swine flu vaccine can be causally linked to GBS up to one year following vaccination. He bases this belief on the theory that the vaccine is effective against swine flu for one year. After that period a booster is recommended for continued protection. He also points to a recent study completed by Keenlyside and Schonberger et al., (supra.)
This study reports thirty-one fatal cases of GBS, with three cases having an onset in the eleventh and twelfth week following vaccination. Dr. Poser argued that this study supports a finding that Mr. Thompson's GBS, with onset in the eleventh week following his inoculation, was caused by the swine flu vaccine.
Dr. Hastings is a practicing neurologist in Tulsa, Oklahoma. He reviewed Mr. Thompson's medical records and testified that he could not conclude that the swine flu vaccine was the cause of Mr. Thompson's GBS. He based this on the absence of a temporal relationship between plaintiff's shot and the onset of his GBS.
Dr. Hastings also relied on several epidemiological studies which place an outside limit of ten weeks for a causative relationship to exist between the swine flu vaccine and GBS. The first of these studies was by Schonberger et al. (supra.) This study reported GBS in vaccinated persons at a rate substantially above that for non-vaccinated persons. This increased risk was evident only up to ten weeks following inoculation. After ten weeks, the risk of contracting GBS was essentially the same for vaccinated and non-vaccinated persons.
A second study was completed by the Michigan Department of Public Health. (Hayner, supra.) This study reported an increased incidence of GBS in vaccinated persons for only forty-two days, or approximately six weeks. Dr. Hastings testified *585 that most of the medical literature was supportive of this more conservative view. See eg. Arnason, supra.
Dr. Hastings also noted that experimental work with animals produced similar results. Animals injected with protein from myelin developed GBS-type demyelinating disorders within one to three weeks following injection. While this test, called Experimental Allergic Neuritis ("EAN"), is not a model of GBS, he testified that the results are felt to be consistent with GBS.[4]
Dr. Hastings did not have an opinion as to the actual cause of Mr. Thompson's GBS. He felt it could have been the minor surgical procedure (cystoscopy) undergone by Mr. Thompson in December, 1976, or the UTI that developed afterward. He also noted that approximately forty percent of GBS cases show no antecedent illness, medical procedure or vaccination.
Dr. Hastings concluded that ten weeks and later between vaccination and onset of GBS is not borne out in clinical practice and the medical literature.

III.

CAUSATION
Mr. Thompson received his swine flu inoculation in Pryor, Oklahoma. Therefore, the law of Oklahoma applies in this case.[5] Under Oklahoma law, a plaintiff must prove by a preponderance of the evidence that his GBS was proximately caused by the swine flu inoculation. Buie v. Reynolds, 571 P.2d 1230 (Okl.App.1977). Proof based on conjecture and speculation is not sufficient to establish causation. Boxberger v. Martin, 552 P.2d 370 (Okl.1976).
In this case we heard the testimony of two neurologists, neither of whom personally examined Mr. Thompson. Both Dr. Poser and Dr. Hastings based their opinions on a review of plaintiff's medical records and the pertinent medical literature. In so doing, they reached differing opinions based on a reasonable degree of medical probability.
We recognize that much is still unknown about disorders such as GBS, and that experienced neurologists disagree about the relationship between GBS and the swine flu vaccine. Yet, we must endeavor to determine that opinion which represents the more probable state of events. We have considered the experience of each doctor, as well as the foundation and logic for their opinions. We find that plaintiff has not proven by a preponderance of the evidence that his GBS was proximately caused by the swine flu vaccine.
We have discussed Dr. Poser's opinion that swine flu vaccine can cause GBS up to one year following inoculation. This opinion is not shared by other prominent neurologists. Studies made to determine the relationship between GBS and the swine flu vaccine indicate an outside limit on causation at ten weeks following inoculation. Most experts agree that the majority of cases will have an onset of symptoms by the fourth week following the shot. Many consider ten weeks to be highly questionable.
We have found that Mr. Thompson received his vaccination on October 25, 1976. There is no dispute that his GBS began on January 8, 1977. Thus, onset of his GBS falls more than eleven weeks after his inoculation. In light of the present state of medical knowledge, and the more persuasive and credible testimony, we are of the view that ten weeks is the acceptable medical and scientific opinion as to an outside parameter of causation.
In Alvarez v. United States, 495 F.Supp. 1188 (D.Colo.1980), we stated that "[t]he parameter of ten weeks may be modified at some future time in the light of reason and experience." 495 F.Supp. at 1207. The more persuasive evidence does not warrant such an extension in this case.
*586 Plaintiff argues that the Keenlyside & Schonberger study (Keenlyside & Schonberger et al., supra.) establishes a statistical-temporal relation between GBS and the swine flu vaccine up to the twelfth week following inoculation. We do not attach the same significance to this study.
This study reports fifty-eight cases of fatal GBS between October 1, 1976 and January 31, 1977. Of these cases, thirty-two had received a swine flu shot within the previous twelve weeks. Three of these had an onset in the eleventh and twelfth week following inoculation. The study does not report how many of the non-vaccinated cases had an onset in the same two weeks.
Unlike the original Schonberger study (Schonberger et al., supra.), there is no indication that those three cases represent a significant increase in the incidence of fatal GBS. While the implication of the study may be to suggest a causal relation between GBS and swine flu vaccine beyond the ten week period, we are not so persuaded. Three cases in one article is not sufficient in light of the overwhelming opinion to the contrary.
Plaintiff has not met his burden of proof in this case. He has not established by a preponderance of the evidence that his GBS was proximately caused by the swine flu vaccine. For this reason, we find and conclude that plaintiff is not entitled to recover against the government.

IV.

CONCLUSION
Much is still not understood about neurological disorders such as GBS. Medical science is beginning to recognize that certain antecedent "triggers", such as viral infections or vaccinations, may cause GBS. However, in over forty percent of the reported cases of GBS, no antecedent event is identified.
Many non-vaccinated people contract GBS every day. Similarly, persons who have been inoculated develop neurologic disorders unrelated to the vaccination. We must sift out those maladies proximately caused by the swine flu vaccine.
We sympathize with the suffering that Mr. Thompson has had to endure as a result of his GBS. The fact remains, however, that the government is liable only where a plaintiff proves that his GBS was caused by the swine flu vaccine. Mr. Thompson has not met that burden of proof.
We would note at this point the exceptional advocacy in this case. Mitchell Lee and Eddie Harper, Esqs. for the plaintiff, and Debra Ratner, Esq. for the defendant, exhibited the highest degree of preparation, scholarship, and trial performance. They are to be commended.

ORDER
For these reasons, we find in favor of the defendant, United States of America, and against the plaintiff, Alvin Thompson. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff, and the complaint and action are dismissed. Each party to pay its or his own costs.
NOTES
[1] United States District Court for the District of Colorado, Sitting by Designation.
[2] The National Swine Flu Immunization Program of 1976 ("Swine Flu Act"), Public Law No. 94-380, 42 U.S.C. § 247b(j)-(l), establishes the FTCA as the vehicle for asserting claims against the United States government arising out of the swine flu program. The following cases deal with the Swine Flu Act and related litigation:

Hunt v. United States, Hollar v. United States, 636 F.2d 580 (D.C.Cir.1980); Sparks v. Wyeth Laboratories, 431 F.Supp. 411 (W.D.Okl.), aff'd per curiam, No. 77-1407 (10th Cir. 1978) (unpublished opinion); Alvarez v. United States, 495 F.Supp. 1188 (D.Colo.1980); Hixenbaugh v. United States, 506 F.Supp. 461 (N.D.Ohio 1980); Heyman v. United States, 506 F.Supp. 1145 (S.D.Fla.1981); Lima v. United States, 508 F.Supp. 897 (D.Colo.1981); Gicas v. United States, 508 F.Supp. 217 (E.D.Wis.1981); Funston v. United States, 513 F.Supp. 1000 (M.D. Pa.1981); Terrell v. United States, 517 F.Supp. 374 (N.D.Tx.1981).
[3] A cystoscopy is a minor surgical procedure involving the direct visual examination of the urinary tract with a cystoscope.
[4] For other discussion of EAN and its relation to GBS, see Anger v. United States, No. 78-F-1128 (D.Colo. July 31, 1980).
[5] 28 U.S.C. § 1346(b) provides that the United States shall be liable to the same extent as a private person would be under the laws of the place where the act or omission occurred.