**Branko LATINOVICH and Marjorie Latinovich, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 79–C–654.**

United States District Court, E. D. Wisconsin.

April 12, 1982.

---

---

Habush, Habush & Davis by Gary R. Kuphall, Milwaukee, Wis., for plaintiffs.

Joseph P. Stadtmueller, U. S. Atty. by Joel R. Levin, Asst. U. S. Atty., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

The plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and the National Swine Flu Immunization Program of 1976, Pub.L.No.94–380, 90 Stat. 1113, codified at 42 U.S.C. § 247b(j)–(*l*) (1976). This act no longer appears in title 42, *see* Pub.L.No.95–626, 92 Stat. 3551. A trial to the court was held on the issue of liability on December 14, 1981, and the parties have submitted post-trial briefs. This decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. BACKGROUND

In late 1976, the United States conducted an immunization program to vaccinate the adult population against the threat of a swine flu epidemic. The background to this was when the prospect of failure by such giants as Penn Central, International Harvester and others would have been unthinkable as well.

program is extensively discussed in *Gicas v. United States*, 508 F.Supp. 217, 218–19 (E.D.Wis.1981); and *Bean v. United States*, 533 F.Supp. 567 (D.Colo., 1980); and need not be set forth here. As part of this program, Mr. Latinovich received a swine flu vaccination on November 6, 1976, three days before his 52nd birthday.

Prior to receiving the shot, Mr. Latinovich had enjoyed good health; his only health problem was periodic hay fever. He led an active physical life, playing tennis and skiing regularly as well as participating in other sports activity. He described his job working as a real estate investment counselor as "vigorous"; as part of his duties he traveled extensively in the course of a year.

Some of the facts surrounding Mr. Latinovich's health for the four months after he received the shot are disputed and will be discussed below. However, there is no dispute about the fact that on March 31, 1977, Mr. Latinovich underwent a stress test and a proctoscopy. The results were normal. On September 18, 1977, Mr. Latinovich admitted himself to the emergency room of West Allis Memorial Hospital; he was diagnosed as suffering from a bilateral ear infection. He took penicillin for two days and the problem cleared up.

On September 24, 1977, Mr. Latinovich was admitted to St. Luke's Hospital, suffering from blurred speech and tingling and numbness in his hands and feet. His condition quickly deteriorated; within twenty four hours he was placed on a respirator and was experiencing paralysis. He was eventually diagnosed as suffering from Guillain-Barre Syndrome (GBS). He responded to treatment and was discharged on November 26, 1977, after a virtually complete recovery.

The plaintiffs filed this action on August 16, 1979, alleging that the swine flu vaccine caused Mr. Latinovich's GBS. On November 2, 1979, the case was transferred by the judicial panel on multidistrict litigation to the United States district court for the District of Columbia for coordinated pretrial proceedings, pursuant to 28 U.S.C. § 1407.

On June 9, 1980, this action was remanded to this court for all further proceedings.

## II. LIABILITY

The government does not dispute that Mr. Latinovich contracted GBS; thus the only issue that remains on the question of liability is causation. In addition to their own testimony, the plaintiffs presented a large volume of written exhibits and testimony. The government also presented much of its case in written form, along with the oral testimony of an expert witness.

Mr. and Mrs. Latinovich both testified that in December, 1976 Mr. Latinovich began to experience weakness and fatigue. He became sluggish and uninterested in social activities. They agreed that they did not attend the Holiday Folk Fair that month because of Mr. Latinovich's fatigue, and they altered their New Year's Eve plans, staying in instead of going out, as was their custom. Mr. Latinovich also testified that he was very reluctant to attend his company's Christmas party; he eventually went, but he did not dance, as he usually did. He also testified that his recreational activity lessened considerably in the months after he received the shot. He did no skiing that winter and also stopped playing tennis.

The plaintiffs argue that this fatigue indicates that Mr. Latinovich was suffering from GBS during this period, but that the onset of the disease in its acute form was delayed. The plaintiffs find support for their "smoldering" GBS theory from an article in the November, 1967 edition of the *Annals of Internal Medicine* authored by Drs. Robert C. Hinman and Kenneth R. Magee and entitled "Guillain-Barre Syndrome with Slow Progressive Onset and Persistent Elevation of Spinal Fluid Protein." Plaintiffs' exh. 7. The article states that there is a "marked rate of variation in the rate of progression of symptoms" of GBS. *Id.* at p. 1007. The article then discusses four case studies that demonstrate the varying rates of onset.

The plaintiffs presented the evidence of three physicians to support their theory of causation. Dr. Gojko Stula, Mr. Latinovich's family doctor, stated that he had been aware of Mr. Latinovich's fatigue, and he believed that this was an early symptom of the GBS. Deposition of Dr. Stula, July 13, 1981, p. 31. Dr. John Porter, a neurologist who treated Mr. Latinovich, stated his opinion that there was a causal connection between the swine flu vaccination and the GBS. Deposition of Dr. Porter, August 14, 1981, p. 14.

The third medical witness was Dr. Joseph Bellanti, professor of pediatrics and microbiology at Georgetown University and director of the International Center of Interdisciplinary Studies of Immunology at Georgetown. Dr. Bellanti was asked to consider Mr. Latinovich's medical history, summarized above, and to assume "that in mid-December, he started to feel sluggish— ... lethargic and fatigued [and] that he continued feeling fatigued, sluggish and run down from March of 1977 to September of 1977." Deposition of Dr. Bellanti, August 17, 1981, p. 13. Dr. Bellanti then stated that "there is a causal relationship between the swine flu and the Guillain-Barre syndromate in this man's illness." *Id.* at p. 29.

The plaintiffs also find support for their theory of "smoldering" GBS in two court decisions. In *Shirley Thompson v. United States*, No. 79–1017–A (E.D.Va., November 6, 1980); *see* plaintiffs' exh. 9; the court accepted the plaintiff's contention that her lethargy was an early sign of the GBS eventually diagnosed, and that her swine flu shot was the cause. A similar ruling is found in *Sanders v. United States*, No. 80–31–A (E.D.Va., July 1, 1981) (opinion from the bench); plaintiffs' exh. 8.

The government raises several criticisms of the plaintiffs' contention that the swine flu vaccine caused Mr. Latinovich's GBS. The government first objects to the plaintiffs' smoldering theory of GBS. The relationship between the swine flu vaccine and GBS was the subject of an extensive study by the Center for Disease Control; its find-

ings were authored by Dr. Lawrence Schonberger. Schonberger, et al., "Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–1977," 110 *American Journal of Epidemiology*, 105, No. 2 (1979); *see* defendant's exh. 103.

The Schonberger study was an epidemiology study—an analysis of the occurrence of a disease in a large population. The study examined the increase of GBS that occurred after the initiation of the vaccination program and concluded:

"Epidemiologic evidence indicated that many cases of GBS were related to the vaccination. When compared to the unvaccinated population, the vaccinated population had a significantly elevated attack rate in every adult age group. The estimated attributable risk of vaccine-related GBS in the adult population was just under 1 case per 100,000 vaccinations. The period of increased risk was concentrated primarily within the 5-week period after vaccination, although it lasted for approximately 9 or 10 weeks." *Id.* at p. 1.

Because the exact cause of GBS has not been determined by medical science, the conclusions of this study must be considered in the evaluation of whether the vaccination caused Mr. Latinovich's GBS. *See Alvarez v. United States*, 495 F.Supp. 1188, 1203 (D.Colo.1980). Especially telling is the Schonberger conclusion that the period of risk for vaccinated people was at most nine to ten weeks after the vaccination.

The government presents extensive other medical testimony to show that GBS is an acute onset disorder, *i.e.*, the symptoms are sudden and severe, characterized by a rapid progression in their severity. The government places considerable reliance on the criteria for the diagnosis of GBS developed by the National Institute of Neurological and Communicative Diseases and Stroke (NINCDS). Defendant's exh. 102. The NINCDS criteria list the primary clinical symptoms of GBS as symmetrical motor weakness and reflex impairment. Clinical features supporting diagnosis of the disease

include in part rapid development of motor weakness for about four weeks and recovery within about two to four weeks after the progression stops. The criteria also state that an elevated cerebrospinal fluid rate after the first week of symptoms is "strongly supportive of the diagnosis." *Id.* This description of GBS is more fully discussed in *Alvarez, supra,* at 1194–96, and in the government's post-trial brief, filed January 5, 1982, pp. 9–14.

The plaintiffs contend that Mr. Latinovich did show symptoms within the ten week period identified in the Schonberger study since he was experiencing fatigue as early as December, 1976. The government disputes the plaintiffs' testimony regarding when the fatigue began, however. It first points to its interrogatory no. 83, which asked when Mr. Latinovich "first experienced any sign or symptom of illness or injury" following the shot. The written answer was "Saturday, September 24, 1977." The plaintiffs argue that when they answered this interrogatory, with the assistance of counsel, they were only referring to *acute* symptoms, not the more general feeling of sluggishness that Mr. Latinovich had experienced earlier. The government responds that the interrogatory answer has never been amended as required by Rule 26(e)(2), Federal Rules of Civil Procedure.

The government also stresses that the voluminous records relating to Mr. Latinovich's hospitalization for GBS contain no reference to any symptoms of fatigue or weakness prior to September, 1977. *See* plaintiffs' exhs. 1–3. These records consist of hundreds of pages of reports, progress reports, physician's orders, and other notes and records. The government points out that Mr. Latinovich was treated or examined by at least fifteen doctors during his approximately two month hospitalization, yet none made any reference to his bouts of weakness. In fact, several notations suggest the contrary. One report, dated September 24, 1977, notes that Mr. Latinovich "was well until about ten days ago, when he noted pain in the ears and some hearing impairment." *See* government's post-trial brief, exh. A. Even Dr. Stula, a family friend who claimed to have known about Mr. Latinovich's sluggishness, noted in a report dated September 29, 1977, that Mr. Latinovich "was well until about ten days ago." *Id.,* exh. C. Other similar notations are also found in these records. *Id.,* exhs. B, D. The records also contradict Mr. Latinovich's testimony that he had experienced tingling and numbness prior to his ear infection. *Id.,* exhs. A, E.

Some courts have held that a patient experiencing a serious health condition should not be expected to have provided his doctors with his complete health history. *See, e.g., Stewart v. United States,* No. 79–517–N (E.D.Va., August 20, 1980). The government urges that Mr. Latinovich's records demonstrate that the doctors treating him received a very complete medical history. The records mention an appendectomy performed almost forty years previously. Government's post-trial brief, exh. A. They also mention the stress test and proctoscopy performed in the spring of 1977. *Id.,* exhs. F, G. The government argues that the records reveal a diligent effort to identify possible precipitating factors of Mr. Latinovich's GBS; in addition to the earache and numbness that had just occurred, one doctor noted on September 28, 1977, that Mr. Latinovich had used an insecticide about one month prior to his hospitalization. The government stresses that it is noteworthy that an investigation of this detail makes no mention of Mr. Latinovich's sluggishness.

The government presents the testimony of its expert witness, Dr. Arthur Turner. Dr. Turner examined Mr. Latinovich and concluded that his GBS was not caused by the swine flu shot. He testified that when he questioned Mr. Latinovich during the examination he made no reference to any weakness or sluggishness prior to September, 1973. I note, however, that on cross-examination, the plaintiffs raised a question regarding Dr. Turner's recollections on that issue.

The defendant also points out that the precision of Mr. Latinovich's testimony at trial about his sluggishness was markedly greater than his previous testimony. At his deposition, Mr. Latinovich could only state that his weakness began "weeks or months" after the swine flu shot. The only documented medical consultation during the period after the swine flu shot was the stress test and proctoscopy.

The parties' positions reveal two major factual disputes—whether Mr. Latinovich suffered the sluggishness about which he testified, and whether the plaintiffs' theory of smoldering GBS has merit. I find the government's position the more persuasive on both issues. However, even if the plaintiffs' position were accepted on both matters, *i.e.*, even if it were assumed, *arguendo*, that the plaintiff did suffer from sluggishness and that the smoldering theory is viable, I would still find that the plaintiffs have not met their burden of proof in this action.

As noted above, the plaintiffs rely on two cases, *Sanders* and *Shirley Thompson*, in which the court accepted the plaintiff's claim that the GBS was caused by the swine flu shot. However, both those cases are distinguishable from the matter at bar. In my opinion, the fatigue of which the plaintiffs in those actions complained was of far greater severity than that described by Mr. Latinovich.

In *Sanders*, the plaintiff required the use of a cane to walk, needed help to lift his feet onto a couch, needed the strength of two arms to get one onto a table, and experienced difficulty writing. *Sanders, supra*, slip op. at 10. Mr. Sanders' fatigue also grew progressively worse, culminating in his hospitalization with GBS within four and a half months from his swine flu inoculation.

In *Shirley Thompson*, the plaintiff experienced weakness and fatigue that grew progressively worse. Her housework fell off and she had little energy. Within a month of the shot, she had problems with her hands; she had difficulty writing, typing, and performing other motor skill work.

She began to experience pains in her legs and had difficulty rising from a sitting position. Within four months of the shot, her hands would go numb and turn white. Shortly thereafter, she was diagnosed as having GBS. *Shirley Thompson, supra*, slip op. at 2–4. In the Hinman and Magee article cited by the plaintiffs to support their theory, the patients in the four case histories suffered fatigue of similar severity and progression.

The weakness allegedly sustained by Mr. Latinovich was not nearly so intense. He continued to work for a prolonged period after the vaccination. During the nine months of 1977 in which he worked, he earned more real estate commissions than he did in 1976, 1979, and 1980. His 1978 income was drastically lessened by an unrelated illness. I do not find the plaintiffs' argument that the 1977 income reflects commissions earned in previous years particularly persuasive, since Mr. Latinovich's income figures for all these years are relatively constant. In addition, Mr. Latinovich's job required considerable travel; in 1977 he logged over 15,000 miles, slightly less than in 1976 and greater than the miles logged in 1978 and 1979. Neither figure suggests a man suffering from the degree of fatigue described in *Sanders* and *Shirley Thompson*.

In both cases relied on by Mr. Latinovich the plaintiffs were diagnosed as having GBS within four to five months of receiving the shot. On the other hand, Mr. Latinovich did not contract GBS until over ten months after the shot. Other courts have rejected theories of delayed onset GBS involving similar periods of delay. *See, e.g., Migliorini v. United States*, 521 F.Supp. 1210 (M.D.Fla.1981) (21 weeks); *Hixenbaugh v. United States*, 506 F.Supp. 461, 370 (N.D.Ohio 1980) (15 months); *Alvarez, supra* (7 months); *Anger v. United States*, No. 80–F–105 (D.Colo., July 31, 1981) (9 months); *Hausler v. United States*, No. 79–2031–A (E.D.Va., March 17, 1981) (7 months); *Gates v. United States*, No. 79–F–875 (W.D.Okla., March 2, 1981) (one year). In addition, courts have found no causal

relationship when the GBS occurred more than ten weeks from the shot. *See, e.g., Alvin Thompson v. United States*, 533 F.Supp. 581 (N.D.Okl., 1981); *Bisi v. United States*, No. H–79–391 (D.Conn., August 28, 1981); *Cox v. United States*, No. 78–359–1 (S.D.Ia., May 22, 1981); *Lima v. United States*, 508 F.Supp. 897 (D.Colo., 1981).

In the Hinman and Magee article, the four patients experienced an elevated cerebrospinal fluid protein content; two had an elevated content for a considerable period of time. Similarly, in *Sanders* and *Shirley Thompson*, the courts placed considerable reliance on the fact that both plaintiffs when admitted to the hospital already had such an elevated cerebrospinal fluid protein content. *See Sanders, supra,* slip op. at 12; *Shirley Thompson, supra,* slip op. at 78.

When Mr. Latinovich was admitted to the hospital in September, 1977, he did not have an elevated spinal fluid protein content. A lab report dated September 27, 1977, lists a spinal fluid protein content within the normal range. *See* government's post-trial brief, exh. H. However, within a few days, Mr. Latinovich's spinal fluid content did rise. *Id.,* exhs. H, I. This is more consistent with the NINCDS criteria for GBS than with the plaintiffs' smoldering theory. The court in *Alvarez* based its finding of no causation on similar evidence regarding spinal fluid protein content. *Id.,* 495 F.Supp. at 1195, 1199, 1200.

The posture of the expert testimony in this case indicates the limited usefulness that such testimony offers a trier of fact. As discussed above, the plaintiffs rely on the testimony of three expert witnesses. At his deposition, Dr. Stula stated his firm belief that the onset of Mr. Latinovich's GBS was two days prior to Mr. Latinovich's calling him in September, 1977. Stula deposition, July 13, 1981, pp. 31–32; *see* Stula deposition, July 9, 1981, pp. 18–19. Dr. Stula at another point expressed no opinion on whether the swine flu shot caused Mr. Latinovich's GBS. Stula deposition of July 13th, pp. 39–40. In light of these statements which support the government's position, Dr. Stula's conclusion is not persuasive.

Dr. Porter said that the shot was "a contributory cause" of Mr. Latinovich's GBS. Porter deposition, p. 29. He also testified that Mr. Latinovich's ear infection was also "a contributing cause" and that it was "possible" that the ear infection was "the greater cause." *Id.* Dr. Porter based his opinion on the information he was given concerning Mr. Latinovich's weakness, although his knowledge of that weakness was limited. He only knew that Mr. Latinovich had experienced weakness in early 1977 and had only learned of these symptoms from Dr. Stula shortly before his deposition. *Id.* at 35.

Dr. Bellanti did not examine Mr. Latinovich. Instead, he was asked a hypothetical question regarding causation which assumed Mr. Latinovich's fatigue. The question posed did not address the degree of sluggishness which Mr. Latinovich experienced, nor did it mention any progression in the weakness. Bellanti deposition, p. 13. Nevertheless, Dr. Bellanti concluded that the swine flu vaccine caused Mr. Latinovich's GBS. *Id.* at 29. The structure of the assumptions presented to the witness raise questions regarding the weight to be given to validity of his opinion.

Further questions are raised by Dr. Bellanti's role in other cases. He has previously testified that the swine flu vaccine caused rheumatoid arthritis; *Gicas, supra,* 508 F.Supp. at 220; and leukoencephalopathy; *Baker v. United States,* No. 78–C–468 (E.D.Wis., March 27, 1981); in both cases this opinion was rejected, and the government was found not liable. In *Gicas,* Chief Judge John Reynolds stated: "Dr. Bellanti's opinion that there is a causal relationship between swine flu inoculation and the plaintiff's injuries is no credible evidence at all." *Id.* at 220. In a number of cases, cited above, courts have rejected Dr. Bellanti's theories regarding swine flu causation of GBS. *See, e.g., Migliorini, Hixenbaugh, Anger, Hausler,* and *Gates.*

Balanced against the questionable testimony of the plaintiffs' witnesses is the impressive array of testimony and medical

literature presented by the government. Included in this is the testimony of Dr. Turner, who examined Mr. Latinovich and concluded that the swine flu vaccination did not cause his GBS. I find that Dr. Turner was a credible witness, and I further find that the government's medical testimony was more significantly persuasive than that presented by the plaintiffs.

One side issue deserves discussion. At trial, the government maintained that the ear infection suffered by Mr. Latinovich was a more likely antecedent event triggering the GBS than the swine flu shot months earlier. The plaintiffs argue that "the Court must decide whether or not this earache was the preceding or triggering event which led to Mr. Latinovich's GBS." In my view, such a finding is not necessary. The plaintiffs have the burden of establishing causation. I recognize that the plaintiffs presented various arguments against the theory that the earache could have been the antecedent event, but that alone does not meet the plaintiffs' burden. The turmoil over whether the ear infection was the antecedent event becomes even less relevant when it is realized that between twenty five and fifty percent of all occurrences of GBS are not preceded by an identifiable event. *See* defendant's exh. 101, p. 1114.

### CONCLUSION

In summary, I find that the plaintiffs have failed to prove by a preponderance of the evidence that Mr. Latinovich's swine flu vaccination caused his GBS. I find the government's position more persuasive on the two major factual disputes: (1) the timing, the existence and the severity of Mr. Latinovich's fatigue and (2) the validity of the smoldering GBS theory. However, even if both issues were resolved in favor of the plaintiffs, I would still find that they had not met their burden of proof. A variety of factors make this case distinguishable from *Sanders* and *Shirley Thompson*, cases upon which the plaintiffs rely heavily. Briefly put, I find this case to be much more akin to *Alvarez* than to either *Sanders* or *Shirley Thompson*.

Therefore IT IS ORDERED that this action be and hereby is dismissed upon its merits.