**Georgia YOUNG, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 79 Civ. 3430.**

United States District Court, S. D. New York.

July 6, 1982.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City (Susan M. Campbell and Leona Sharpe, Asst. U. S. Attys., New York City, of counsel), for defendant.

Paul D. Rheingold, New York City, for plaintiff.

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDELSTEIN, District Judge:

This is an action under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, in conjunction with the National Swine Flu Immunization Program Act ("Swine Flu Act"), 42 U.S.C. § 247b. Plaintiff alleges that on or about November 17, 1976, she received a swine flu vaccination at United Hospital in Port Chester,

New York, as a result of which she sustained injury. The action was transferred to the District of Columbia for coordinated and consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407. Upon completion of these proceedings, the case was remanded to this district for trial. *See* Final Pretrial Order, *In Re Swine Flu Immunization Products Liability Litigation*, MDL No. 330, Misc. No. 78–0040 (D.D.C. Nov. 15, 1979).

After a full trial on the merits, and after consideration of all the evidence, the court finds that plaintiff was adequately warned of the potential risks of the swine flu vaccination and finds no liability on the part of defendant. The court makes the following Findings of Fact and Conclusions of Law.

### Introduction [1]

The Swine Flu Act was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history, and over 45 million Americans—or one-third of the adult population—were vaccinated. The initial vaccination was on October 1, 1976, and the program was suspended on December 16, 1976. The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March.

The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:

1.  The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of a program participant upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty; 42 U.S.C. § 247b(k)(2)(A);

2.  It makes that cause of action the exclusive remedy (42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and

3.  It makes the procedures of the FTCA applicable to suits brought pursuant to the Swine Flu Act (42 U.S.C. § 247b(k)).

The program was prompted in part by the medical discovery in early February, 1976 at Fort Dix, New Jersey, of military servicemen having a new strain of influenza virus antigenically related to the virus prevalent during the 1918–19 swine flu pandemic. That pandemic was responsible for 20 million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to human, with no secondary person-to-person transmission.

History has demonstrated that no swine flu epidemic occurred during the winter of 1976–77. As one might expect, many people who were inoculated incurred discomforts, illnesses, or injuries in a period relative to the vaccination. Lawsuits such as the instant one were filed throughout the country for illnesses allegedly resulting from the swine flu immunization program. In addition, numerous administrative claims have been filed.

---

[1].  This introduction, to the extent that it is relevant to the instant case, is taken from *Bean v. United States*, 533 F.Supp. 567 (D.Colo.1980).

## Findings of Fact

1. Plaintiff Georgia Young[2] was born on December 11, 1932.

2. In her childhood years, plaintiff reacted allergically to several types of food, for which she was vaccinated by a physician. In her early twenties, plaintiff had an allergic reaction after receiving an oral polio vaccination. However, plaintiff had no history of allergic reaction to egg.

3. On November 17, 1976, plaintiff was a resident of the State of New York.

4. On November 17, 1976, plaintiff received a swine flu inoculation at United Hospital, Port Chester, New York pursuant to the Swine Flu Act. Port Chester, New York is in the Southern District of New York.

5. Plaintiff went to United Hospital with a friend, Blanche Fowler. When they arrived at the hospital, plaintiff and Ms. Fowler joined a group of people waiting to register for the inoculation.

6. While registering for her inoculation, plaintiff was handed two printed pages. The first page was an introduction to and a summary of the swine flu vaccination program.[3] The second page was a consent form entitled "IMPORTANT INFORMATION ABOUT SWINE INFLUENZA (FLU) VACCINE (MONOVALENT)." The full text of the consent form is as follows:

### The Disease

Influenza (flu) is caused by viruses. When people get flu they may have fever, chills, headache, dry cough or muscle aches. Illness may last several days or a week or more, and complete recovery is usual. However, complications may lead to pneumonia or death in some people. For the elderly and people with diabetes

---

2. Plaintiff remarried in June, 1981 and is now known as Georgia Young Pellegrino.

3. The introduction sheet was entitled "IMPORTANT INFORMATION FROM THE U.S. PUBLIC HEALTH SERVICE ABOUT SWINE FLU AND VICTORIA FLU VACCINES." The full text is as follows:

INTRODUCTION

You probably have heard a good deal about swine flu and swine flu vaccine. You may know, for example, that swine flu caused an outbreak of several hundred cases at Ft. Dix, New Jersey, early in 1976—and that before then swine flu had not caused outbreaks among people since the 1920's.

With the vast majority of Americans being susceptible to swine flu, it is possible that there could be an epidemic this winter. No one can say for sure. However, if an epidemic were to break out, millions of people could get sick. Therefore, a special swine flu vaccine has been prepared and tested which should protect most people who receive it. Certain people, such as those with chronic medical problems and the elderly, need annual protection against flu. Therefore, besides protection against swine flu, they also need protection against another type of flu (Victorian flu) that was around last winter and could occur again this winter. A separate vaccine has been prepared to give them protection against both types of flu.

These vaccines have been field tested and shown to produce very few side effects. Some people who receive the vaccine had fever and soreness during the first day or two after vaccination. These tests and past experience with other flu vaccines indicate that anything more severe than this would be highly unlikely.

Many people ask questions about flu vaccination during pregnancy. An advisory committee of the Public Health Service examined this question and reported that "there are no data specifically to contraindicate vaccination with the available killed virus vaccine in pregnancy. Women who are pregnant should be considered as having essentially the same balance of benefits and risks regarding influenza as the general population."

As indicated, some individuals will develop fever and soreness after vaccination. If you have more severe symptoms or if you have fever which lasts longer than a couple of days after vaccination, please consult your doctor or a health worker wherever you receive medical care.

While there is no reason to expect more serious reactions to this flu vaccination, persons who believe that they have been injured by this vaccination may have a claim. The Congress recently passed a law providing that such claims, with certain exceptions, may be filed only against the United States Government. Information regarding the filing of claims may be obtained by writing to the U.S. Public Health Service Claims Office, Parklawn Building, 5600 Fishers Lane, Rockville, Maryland 20852.

Attached is more information about flu and flu vaccine. Please take the time to read it carefully. You will be asked to sign a form indicating that you understand this information and that you consent to vaccination.

or heart, lung, or kidney diseases, flu may be especially serious.

It is unlikely that you have adequate natural protection against swine flu, since it has not caused widespread human outbreaks in 45 years.

*The Vaccine*

The vaccine will not give you flu because it is made from killed viruses. Today's flu vaccines cause fewer side effects than those used in the past. In contrast with some other vaccines, flu vaccine can be taken safely during pregnancy.

One shot will protect most people from swine flu during the next flu season; however, either a second shot or a different dosage may be required for persons under age 25. If you are under 25 and a notice regarding such information is not attached, this information will be provided to you wherever you receive the vaccine.

*Possible Vaccine Side Effects*

Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache, or muscle aches within the first 48 hours.

*Special Precautions*

As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

* Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
* People with known allergy to eggs should receive the vaccine only under special medical supervision.
* People with fever should delay getting vaccinated until the fever is gone.
* People who have received another type of vaccine in the past 14 days should consult a physician before taking the flu vaccine.

*If you have any questions about flu or flu vaccine, please ask.*

7. At the bottom of the consent form, there was a space for persons receiving the inoculation to fill in information and sign their names.

8. Plaintiff read the consent form that was given to her at United Hospital and signed it.

9. Above the signature and below the heading "REGISTRATION FORM," the following statement appears:

I have read the above statement about swine flu, the vaccine, and the special precautions. I have had an opportunity to ask questions, including questions regarding vaccination recommendations for persons under age 25, and understand the benefits and risks of flu vaccination. I request that it be given to me or to the person named below of whom I am the parent or guardian.

10. Plaintiff's signature on the consent form acknowledged and confirmed that she read the consent form including the paragraphs describing the swine flu, the swine flu vaccine, and the special precautions relating to the swine flu vaccine. Plaintiff's signature also acknowledged and confirmed that she had an opportunity to ask questions about the swine flu vaccine program, that she understood the risks and benefits of the swine flu vaccine, and that she had requested that the vaccine be given to her.

11. A sign prominently displayed in the registration area gave the same warnings as were contained in the "Special Precautions" section of the consent form.

12. On November 17, 1976, there was a doctor on duty at United Hospital, available to answer the questions of potential vaccinees regarding the swine flu vaccine. There were also nurses on duty at all times.

13. On or about November 19, 1976, plaintiff developed hives.

14. Prior to the initiation of the Swine Flu Program in 1976, the only reasonably

foreseeable risk of allergic reaction to influenza vaccine was for persons with a known egg allergy.[4]

15. Plaintiff's history of allergic reactions did not contraindicate the swine flu vaccine in 1976. Doctor Michael H. Grieco, the Director of the R. A. Cooke Institute of Allergy at St. Luke's-Roosevelt Hospital Center and chief of that hospital's Division of Infectious Diseases in Epidemiology and Division of Allergy and Clinical Immunology, testified convincingly that there was nothing in plaintiff's medical history which would have precluded a reasonable person from having the vaccination administered.[5]

16. A reasonably prudent person in plaintiff's position fully informed of the risks and benefits known at that time would have elected to receive the vaccine.

4. In a report by the National Influenza Immunization Program, Surveillance and Assessment Center, Center for Disease Control, entitled Illness After Influenza Vaccination Reported Through a Nationwide Surveillance System: General Review, Multidistrict Litigation Document Number 116, it was noted that from October 1, 1976 to December 16, 1977, 48,161,019 vaccinations were administered and as of January 1, 1978 only forty-two cases of hives were reported.

5. Greico Tr. at 38. It should be noted, however, that there was some conflicting testimony as well. Doctor Robert A. Mayers, an allergy consultant from Westchester, New York who examined the plaintiff in 1980, testified that plaintiff's "strong past history of allergies" may have convinced him to refrain from giving a swine flu vaccination to plaintiff. "In my community I believe the majority of physicians would have been reluctant to give any type of flu vaccine, swine flu or any of the other types of flu vaccine that were then available if they knew the patient had a strong past history of allergies... [Georgia Young] had a past history of having hives and she had a past history of having had a generalized hives following an oral polio vaccine." Mayers Tr. at 46, 50. The court found Dr. Mayers' testimony unpersuasive.

6. In the first reported decision by a court of appeals considering claims of liability against the United States under the Swine Flu Act, Petty v. United States, 679 F.2d 719 (8th Cir. 1982), the Eighth Circuit recently reversed and remanded a decision of the District Court for the Northern District of Iowa which had held a consent form identical to the one used by Unit-

## CONCLUSIONS OF LAW

■ Under the FTCA, state law determines the standard of conduct against which the allegedly tortious government acts are to be measured. Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). In addition, it has recently been held that state law determines the proper standard of conduct of tortious acts under the Swine Flu Act. Petty v. United States, 679 F.2d 719 (8th Cir. 1982).[6,7] The legal standard in New York governing plaintiff's claim of lack of informed consent is found in N. Y. Public Health Law § 2805–d (McKinney). The elements required to be proven are as follows:

(1) what risks and benefits involved in the shot were "reasonably foreseeable" (§ 2805–d(1));

ed Hospital and signed by the plaintiff in this case inadequate under Iowa law and under a so-called "national standard." The court of appeals held that the district court had used an incorrect standard of liability, finding that there is no "national standard" under the Swine Flu Act, and that the proper standard is the same as the one under the FTCA, i.e. "the law of the place where the act or omission occurred". Petty v. United States, 679 F.2d 727 quoting 42 U.S.C. § 247b(k)(2)(A) (1976) (Federal Torts Claims Act). The court found further that the district court had not properly and fully analyzed the consent form under Iowa law, and remanded the case for such a ruling.

It should also be noted that the opinion of the Iowa district court in Petty had been severely criticized by other courts. See, e.g., Elsworth v. United States, No. 78–2553 (D.N.J., filed March 4, 1981); Daniels v. United States, No. 78–X–0987–S (N.D.Ala., filed Sept. 21, 1981).

7. The adequacy of the informed consent form used by the United Hospital and signed by the plaintiff has been upheld by numerous courts in other circuits using the applicable state law. See Warner v. United States, 522 F.Supp. 87 (M.D.Fla.1981); Debuhr v. United States, No. 80–1247 (D.Kan., filed April 22, 1981); Elsworth v. United States, No. 78–2553 (D.N.J., filed March 4, 1981); Morrison v. United States, No. 78–7238 (E.D.Mich., filed March 3, 1981); Gundy v. United States, No. 79–F–587 (D.Colo., filed Sept. 4, 1980); Bean v. United States, 533 F.Supp. 567 (D.Colo.1980); Cikins v. United States, No. 78–328A (E.D.Va., filed June 16, 1980). But see Hasler v. United States, 517 F.Supp. 1262 (E.D.Mich.1981).

(2) what risks and benefits a reasonable medical practitioner under similar circumstances would have disclosed (§ 2805–d(1));

(3) whether a reasonably prudent person in plaintiff's position would not have received the shot if she had been fully informed (§ 2805–d(3));

(4) whether defendant, after considering all of the attendant facts and circumstances, used reasonable discretion as to the manner and extent to which such alternatives or risks were disclosed to the plaintiff (§ 2805–d(4)(d)).[8]

In *Kaempfe v. Lehn and Fink Products Corp.*, 21 App.Div.2d 197, 249 N.Y.S.2d 840 (App.Div.1964), *aff'd mem.* 20 N.Y.2d 818, 284 N.Y.S.2d 708, 231 N.E.2d 294 (1969), the New York standard on the adequacy of a warning was discussed. In that case, the Appellate Division of the New York Supreme Court rejected a challenge to the adequacy of a warning published by a drug manufacturer. Plaintiff alleged that she had sustained a severe case of dermatitis resulting from an allergic reaction to a deodorant manufactured by the defendant. Conceding that an allergic reaction to this deodorant is rare, the plaintiff alleged that the defendant manufacturer had been negligent in failing to warn the few people who might suffer such a reaction. She also claimed that the label's statement "safe for normal skin" was inadequate.

The Appellate Division held the following issue determinative in this case: Whether the product contained an ingredient "to which a substantial number of the population are allergic" and if so, whether there was adequate warning against the possibility of such an allergic reaction. The court

explained: "[I]f the allergy is one common to any substantial number of possible users, the seller may be required at least to give warning of the danger." 249 N.Y.S.2d at 845.

Applying this test, the court held that plaintiff had failed to satisfy her burden and did not show that defendant was remiss in not warning the defendant since she had not proven

(1) that she was one of a substantial number or of an identifiable class of persons who were allergic to defendant's product, *and* (2) that defendant knew or with reasonable diligence should have known of the existence of such number or class of persons.

249 N.Y.S.2d at 848.

In the present case, defendant has shown that the only substantial identifiable class of persons predictably allergic to the swine flu vaccine were those allergic to egg. Defendant specifically and adequately warned against the risk of such an allergic reaction in its informed consent form and in the notice in the registration area.[9] In addition, there was also a general warning of the possibility of an allergic reaction in the consent form. Plaintiff is not among the group of egg-sensitive individuals and thus, it was not reasonably foreseeable that she would react in the manner that she did to the inoculation. Therefore, defendant is not liable for the failure to warn plaintiff more particularly against her specific reaction. The general warning of the possibility of an allergic reaction was sufficient and adequate.

Plaintiff has failed to establish by a preponderance of all credible evidence any neg-

---

**8.** The statute also notes that the following elements may be relevant in a case involving the adequacy of an informed consent form:

(1) whether the lack of informed consent proximately caused the injury of the plaintiff (§ 2805–d(3));

(2) whether the risk not disclosed is too commonly known to warrant disclosure (§ 2805–d(4)(a));

(3) whether the plaintiff informed any inoculant that she would receive the shot regardless of the risk involved (§ 2805–d(4)(b));

(4) whether consent by the plaintiff was not reasonably possible (§ 2805–d(4)(d));

However, this court finds it unnecessary to reach these issues in the present case.

**9.** The following warning is included in the precaution section of the consent form: "In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:

* . . . People with known allergy to eggs should receive the vaccine only under special medical supervision."

ligence on the part of the United States in failing to adequately warn of the risks of the swine flu vaccine. Plaintiff was warned of all reasonably foreseeable risks. Plaintiff's consent to the vaccination was informed. A reasonably prudent person, having been informed of these risks, would not have foregone the shot based on these warnings.

Plaintiff, therefore, has failed to satisfy her burden of proof in this action. Accordingly, defendant is entitled to judgment on the merits.

The foregoing shall constitute the court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.