Irene WELDON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 81–CV–1145.

United States District Court,
N.D. New York.

Sept. 13, 1990.

Stephen Lance Cimino, Syracuse, N.Y., for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice (Roger D. Einerson, Asst. Director, Torts Branch, Civ. Div., of counsel), Washington, D.C., for defendant.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

The complaint in the instant action was filed on October 20, 1981. The action is brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and the National Swine Flu Immunization Program of 1976 (the "Swine Flu Act"), 42 U.S.C. § 247b. As the result of a swine flu shot, plaintiff, Irene Weldon, claims to have contracted various ailments, most notably neurological disorders: Guillain–Barre Syndrome ("GBS"), and viral meningio-encephalitis. Complaint ¶ 5. The United States of America (the "government") presently moves for summary judgment dismissing the complaint. The plain-

---

tiff also moves for summary judgment on two issues. She asks the court to find as a matter of law the inadequacy of the consent form which she signed prior to receiving the shot. Second, she seeks a holding that she suffered a central nervous system disorder.

In general, there is no dispute as to the facts which underlie plaintiff's complaint. The dispute between the parties revolves around the conclusions to be drawn from the underlying facts.

## BACKGROUND

On November 16, 1976 plaintiff received a swine flu vaccination at the PennCan Mall in North Syracuse, New York. Before she received the shot plaintiff signed a consent form which, among other information, stated: "As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists." For more than two years following the shot, plaintiff sought medical care for various complaints, including sore throats, swollen left jaw, chest pain and colds. During this period, she also claims to have suffered on numerous occasions from being generally weak and being weak in the legs or knees.

On February 19, 1979 plaintiff was admitted to Saint Joseph's Hospital, Syracuse, New York. She sought care with respect to an illness which had its onset in the previous month. She complained of a high fever, shakes, body aches, loss of appetite, stiff neck, lethargy and sleeping all the time. Her temperature at the time of her initial examination at the hospital was 102.4°F. Plaintiff was admitted to the Intensive Care Unit ("ICU"). The extensive, if not overwhelming, record presented to the court indicates that plaintiff was transferred out of ICU "to the floor," but neither party has indicated when this happened. During her stay at the hospital, among many other procedures, a tracheostomy was performed on plaintiff; she required the assistance of a respirator; she had a catheter attached to her bladder which was not functioning; and nasogastric tubes were implaced to feed her.

Plaintiff was discharged from the hospital on April 25, 1979. Government's Exhibit ("Govt's Exh.") 1A, at 322. She, however, was transferred to the Extended Care Facility ("ECF") at St. Joseph's Hospital and was discharged from that facility in early May of 1979. *Id.* at 550. A report prepared under the name of Dr. Thomas Scalea summarized plaintiff's stay at St. Joseph's Hospital prior to her transfer to the ECF. *Id.* at 5. Dr. Scalea's report listed as final diagnoses: Viral Meningo-encephalitis, Guillain–Barre syndrome, Interstitial lung disease, and Urinary tract infection. Upon plaintiff's discharge from the ECF, Dr. Patricia Elliott signed a form entitled, "Physician's Statement For Determination Of Employment." In that form Dr. Elliott reported plaintiff's diagnosis as "(1) Guillain–Barre Syndrome, Encephalo Myelitis, (2) Urinary retention." Plaintiff's Exhibit 1, at 5.

The government has highlighted several pieces of laboratory and clinical evidence gathered during plaintiff's stay at St. Joseph's. First, it points to the laboratory results from examining plaintiff's spinal fluid. Her cerebrospinal fluid ("CSF") contained an increased white cell count and low sugar. In addition, there was an initially high CSF protein count, which then decreased. *See* Docket No. ("Doc.") 87. Clinically, plaintiff's knee reflexes on admission were hyperactive; she demonstrated a Babinski's sign;[1] she had a high fever; she had persistent bladder infection; and there was a finding "compatible with left optic nerve dysfunction." Govt's Exh. 1A, at 43.

These factors are relevant because they relate to the actual diagnosis of plaintiff's illness. The government contends that plaintiff suffered from a disease of the central nervous system. Plaintiff, to the contrary, contends that she suffered from both a central nervous system disorder and Guillain–Barre Syndrome which effects the peripheral nervous system. The dispute is

---

1. The Babinski's reflex is "dorsiflexion of the big toe on stimulating the sole of the foot." *Dorland's Illustrated Medical Dictionary,* at 1135 (26th ed. 1981).

important. If the court were to find that plaintiff suffered from Guillain–Barre Syndrome, she would not be required to prove a theory of liability for her injuries, e.g., negligence or breach of warranty. The government has so stipulated in the Multi–District Litigation relating to swine flu cases. *In Re Swine Flu Immunization Products Liability Litigation*, MDL Docket No. 330, ¶ 9 (November 15, 1979) (Final Pretrial Order); *see* Government's Brief in Support of its Motion, Doc. 50, at 5 n. 4; Government's Reply Brief, Doc. 79, at 6 n. 4. That stipulation is binding on the instant action. *See In Re Swine Flu, supra,* ¶ 9.

## DISCUSSION

The government moves for summary judgment on four grounds. First, it contends that plaintiff has offered no evidence to establish that her 1979 illness was GBS. Second, the government argues that plaintiff has failed to raise a genuine issue of fact that her swine flu shot caused her illness in 1979. Third, the government claims that, given plaintiff's failure to provide evidence that she suffered from GBS, she has not shown any theory of liability on which she may prevail. Finally, the government argues that summary judgment is appropriate because of the admissions resulting from the plaintiff's failure to respond to the re-service of the government's first request for admissions. This request was originally answered by the plaintiff pro se. After the plaintiff retained attorney Stephen Lance Cimino, the government re-served the first request for admissions. However, the first request was not answered after the re-service.

Prior to addressing these contentions, the court will review the question of which substantive law is applied to the instant action. Plaintiff has filed this action pursuant to the Swine Flu Act and the FTCA. Under both provisions, the court is to apply the substantive law of the State of New York. *See* former 42 U.S.C. § 247b(k)(2)(A)(i); *Grill v. United States*, 516 F.Supp. 15, 17 (S.D.N.Y.1981) (Swine Flu Act), *aff'd without opinion sub nom., United States v. Solomon*, 697 F.2d 300 (2d Cir.1982); 28 U.S.C. § 1346(b); *Young v. United States*, 542 F.Supp. 1306, 1310 (S.D.N.Y.1982) (FTCA).

The government's first contention is that plaintiff will not be able to prove that she was afflicted with GBS. The government has presented for the court the depositions and affidavits of numerous physicians familiar with plaintiff's case. All concur that plaintiff did not suffer from GBS. In light of a new review of plaintiff's medical records, plaintiff's treating neurologist and interns agree that the original diagnosis, that plaintiff suffered from GBS, was incorrect. In this regard the neurologist, Dr. Antonio V. Marasigan, states: "the increased white cell count, low CSF sugar, and positive Babinski signs are all characteristic of infection of the central nervous system and the increase in the number of cells in the CSF is inconsistent with Guillain–Barre, as is an initially high CSF protein count which decreases while the clinical picture worsens." Affidavit of Dr. Antonio V. Marasigan, Govt's Exh. 49, at 3.

The government points out that plaintiff has not identified any expert witness who will testify that she suffered from GBS. Plaintiff responds that she has raised a genuine issue as to this fact because, as the court has noted, upon plaintiff's discharge from St. Joseph's, she was diagnosed as having GBS. She also argues in her Memorandum of Law that she did suffer from GBS.

Swine flu cases are essentially medical malpractice cases. *Unthank v. United States*, 732 F.2d 1517, 1521 (10th Cir.1984). Under New York law which governs in this case, "unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Keane v. Sloan–Kettering Institute for Cancer Research*, 96 A.D.2d 505, 506, 464 N.Y.S.2d 548, 549 (2d Dept.1983). The rule of providing expert testimony in medical malpractice cases applies to non-jury cases. *Sitts v. United States*, 811 F.2d

736, 740 (2d Cir.1987). It does not apply, however, to circumstances in which "anyone would be expected to identify without difficulty" the proper medical procedure, such as which leg to take off or which tooth to take out. *Id.* at 741. This court has no difficulty holding that the issue of whether plaintiff suffered from GBS falls outside the unassisted competence of a lay trier-of-fact.

Furthermore, in the instant case the government has proffered substantial amounts of evidence that plaintiff did not suffer from GBS. As a result, there is no doubt that "plaintiff cannot prevail without introducing expert medical testimony." *Id.* Plaintiff has, however, neither tendered an affidavit or deposition testimony, nor identified a qualified expert who will testify that she suffered from GBS. Plaintiff's own argument that she suffered from GBS will not suffice to deny the government summary judgment on the issue of whether she suffered from GBS. *Keane v. Sloan-Kettering Institute for Cancer Research,* 96 A.D.2d at 506, 464 N.Y.S.2d at 549.

Plaintiff's attempt to establish a genuine issue of fact by relying on the diagnosis upon her discharge is to no avail. All the doctors who made that diagnosis have subsequently revised it based upon further review of the clinical and laboratory findings. In affidavits presented by the government, they now unanimously conclude that plaintiff did not suffer from GBS. *See, e.g.,* Docs. 85, 87, & 91. These affidavits cast serious doubt on the diagnoses upon which plaintiff relies. Given the fact that plaintiff has not produced one expert who opines that she suffered from GBS, the government is entitled to summary judgment on the issue and the court concludes as a matter of law that plaintiff did not suffer from GBS.

At oral argument plaintiff's counsel asked the court to deny summary judgment pursuant to Fed.R.Civ.P. 56(f). Rule 56(f) permits the court to deny entry of summary judgment if it should "appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present affidavit facts essential to justify the party's opposition." In this case the court is precluded from denying the government's motion pursuant to Rule 56(f). Plaintiff has not provided the affidavit which the Rule contemplates. Without the affidavit, the plaintiff may not invoke the aid of Rule 56(f). *Burlington Coat Factory Wrhse. Corp. v. Esprit de Corp,* 769 F.2d 919, 926 (2d Cir.1985). Furthermore, as is all too readily apparent, this action has been pending since 1981 which indicates that plaintiff has had more than ample time to conduct discovery and investigation. *See Baylis v. Marriott Corp.,* 906 F.2d 874, 878 (2d Cir.1990) (rejecting plaintiffs' contention that district court should have permitted more discovery in part because the action had been pending since 1985). The court declines to deny summary judgment on Rule 56(f) grounds.

■ The government's second contention is that the plaintiff has failed to raise a genuine issue of fact regarding whether the swine flu shot caused her illness that she suffered in 1979. In this prong of its argument, the government argues that the court should hold that plaintiff has not set forth specific facts going to causation even though she has produced an expert who has opined that her 1979 illness was caused by the swine flu shot. The government maintains that this expert, Dr. Joseph Bellanti, professes a theory of causation that is merely an hypothesis and therefore not to be accorded any weight, even on a motion for summary judgment. The government cites numerous swine flu cases in which federal courts have not credited Dr. Bellanti's trial testimony because it was found to be conjecture. *See, e.g., Novak v. United States,* 865 F.2d 718, 722–23, 725 (6th Cir.1989); *Gicas v. United States,* 508 F.Supp. 217, 220 (E.D.Wisc.1981). Plaintiff, in turn, claims to know of cases in which courts accepted Dr. Bellanti's testimony. Despite this claim, she has not provided the court with one citation.

Dr. Bellanti's theory of causation was summarized in his deposition. He stated:

I think we have to put ... in perspective ... the history of when [the plaintiff] was immunized in November of

1976, the initial findings that occurred within a month, the weakness of the legs, the falling asleep and tingling of the hand, and then later what appeared to be a natural infection occurring in 1977, and then in January of 1979 a flu-type virus where there was then an exacerbation of this neurologic involvement, with weakness, inability to stand, inability to use the arms and extremities. Then her speech became slurred.

So we are not talking about a single insult. We're talking about an immunization that was given that set up a sensitization. She had initial symptoms that were evanescent, that appeared and then disappeared.

Then when she got the natural infection, there was an exacerbation or what I call an anamnestic response, and that is a hastening of the immune response that then causes further damage.

Bellanti Deposition ("Dep."), Govt's Exh. 15, at 39–40.

The government responds with an impressive barrage of reasons why Dr. Bellanti's opinion is too hypothetical to meet the plaintiff's burden in responding to the government's motion for summary judgment. Dr. Bellanti has no epidemiological or biochemical evidence that the swine flu shot caused the plaintiff's 1979 illness. Bellanti Dep. at 105, 130–32. That shortcoming is underscored by the fact that plaintiff has not come forward with any epidemiological studies which demonstrate that the illnesses she suffered were related to the swine flu vaccine.[2] Dr. Bellanti's theory is further undercut by the fact that his own textbook, *Immunology III* (3d ed. 1985), does not refer to his theory of causation with respect to adverse neurological responses. Bellanti Dep. at 115. Moreover, numerous doctors have given their opinions that the plaintiff's 1979 illness was not caused by the swine flu vaccination. Declaration ("Decl.") of Dr. Maurice

Victor, Govt's Exh. 9, at ¶ 6; Decl. of Dr. Leonard Kurland, Govt's Exh. 10, at ¶ 8; Dep. of Dr. Charles Poser, Govt's Exh. 16, at 4; Decl. of Dr. Antonio Marasigan, Govt's Exh. 49, at ¶ 11; Decl. of Dr. Tarakad S. Ramachandran, Govt's Exh. 50, at ¶ 10; *see also* Decl. of Dr. John DeSimone, Govt's Exh. 48, at ¶ 10; Govt's Exh. 1A, at 40 (letter from Dr. Richard Restak). Their medical opinions are best summarized by Dr. Poser, a neurologist, who stated at his deposition that he "was pretty much convinced, because of the time lag of two years, that it was too long" a period of time between the shot and the onset of plaintiff's illness for the illness to be connected to the flu shot. Poser Dep., Govt's Exh. 16, at 4. By contrast, Dr. Poser, who examined the plaintiff, has accepted causation for "periods of time as long as ... four or five months, or even six months. Two years is a very long time...." *Id.*

This court is particularly impressed with the fact that neither the plaintiff nor Dr. Bellanti can cite any epidemiological studies which support the doctor's opinion that plaintiff's 1979 illness was related to the swine flu vaccine. *See In re Swine Flu Immunization Products Liability Litigation,* 508 F.Supp. 897, 907 (D.Col.1981) ("[w]here ... the exact organic cause of a disease cannot be scientifically isolated, epidemiologic data becomes highly persuasive"), *aff'd sub nom., Lima v. United States,* 708 F.2d 502 (10th Cir.1983). Indeed, "no objective scientific tests or adequate studies clearly support the thesis that [Dr. Bellanti] advocate[s]." *Novak,* 865 F.2d at 725. Accordingly, the court holds that Dr. Bellanti's thesis is too hypothetical for plaintiff to prove causation at trial. *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) (summary judgment is appropriate when the facts submitted in opposition are only an expert's theoretical speculations); *In re Agent Orange Product Liability Litiga-*

---

**2.** Indeed, a study which reflected "a nationwide surveillance system ... to evaluate illnesses that would be temporally associated with influenza vaccination" concluded that "[o]ther than the Guillain–Barre syndrome and rare cases of anaphylaxis, no serious illnesses were causally asso-

ciated with influenza vaccination...." H. Retailliau, et al., *Illness After Influenza Vaccination Reported Through a Nationwide Surveillance System, 1976–1977,* American Journal of Epidemiology, March 1980, at 270 (Govt's Exh. 41).

*tion,* 611 F.Supp. 1223, 1258 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). Because plaintiff is unable to prove causation, the court grants summary judgment to the government and dismisses the action. The failure on the issue of causation is dispositive and the court need not consider or decide the final two arguments advanced by the government in support of its motion. In addition, plaintiff's cross-motion for summary judgment need not be considered.

The clerk of the court is directed to enter judgment for the defendant.

It is So Ordered.